IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

M.W., a minor,                          *
by and through his parents,
Shuzhou Wang and Yuxue Gao,             *
and on their own behalf,
                                        *
        Plaintiffs,                          CASE NO. 3:06-CV-49(CDL)
                                        *
        v.
                                        *
CLARKE COUNTY SCHOOL DISTRICT,
                                        *
        Defendant.
_____     *


O R D E R

Plaintiffs Shuzhou Wang and Yuxue Gao are the parents of M.W., an autistic child. Plaintiffs appeal the final order of Administrative Law Judge ("ALJ") Chris A. Foster finding that Defendant Clarke County School District ("Defendant" or "CCSD") provided M.W. a free appropriate public education ("FAPE") in the least restrictive environment ("LRE") in accordance with the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Presently pending before the Court is Defendant's Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 59). For the following reasons, the Court grants Defendant's motion.

STANDARD OF REVIEW

The IDEA permits "any party aggrieved" by the final decision of an ALJ "to bring a civil action . . . in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). The district court "shall receive the

records of the administrative proceedings;" "shall hear additional evidence at the request of a party;" and "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C).

In this case, Defendant moves for dismissal on the basis of Federal Rule of Civil Procedure 12(b)(6).[1]  Defendant asserts that

> Plaintiffs have failed to state a cognizable cause of action on their own behalf under the Individuals with Disabilities Education Act ("IDEA"), and Plaintiffs' Amended Complaint, on its face, and the administrative hearing record fail to allege or demonstrate any basis for overturning the March 6, 2006 decision of OSAH Administrative Law Judge Foster.

(Def.'s Mot. to Dismiss Am. Compl. 1.)  Generally, dismissal of an IDEA appeal "is appropriate 'when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action.'"  *D.P. ex rel. E.P. v. Sch. Bd. of Broward County*, 483 F.3d 725, 728-29 (11th Cir. 2007) (quoting *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).

---

[1] There is some question regarding what procedural vehicle is most appropriate to trigger a final decision by the district court in an IDEA appeal.  *See, e.g., Walker County Sch. Dist.*, 203 F.3d at 1297 n.11 (observing that "a motion for summary judgment . . . may not be an appropriate procedural device for triggering a district court decision because the district court in reviewing the administrative record, whether additional evidence is taken or not, must weigh and decide disputed issues of fact, an improper exercise under Rule 56"); *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir. 2003) ("[T]he district court's decision is perhaps better described as judgment on the record.") (internal quotation marks omitted).

Ordinarily, the Court cannot consider matters outside the parties' pleadings in determining whether dismissal is appropriate under Rule 12(b)(6). *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1968 (2007). In an administrative appeal, however, the Eleventh Circuit has found that when the parties are "well aware of the fact that consideration of the administrative record must be the basis for the trial court's decision[,]" the trial court may properly consider the administrative record on a 12(b)(6) motion. *Washington v. Office of the Comptroller of the Currency*, 856 F.2d 1507, 1511 (11th Cir. 1988); *see also DeKalb County Sch. Dist. v. J.W.M.*, 445 F. Supp. 2d 1371, 1378 n.8 (N.D. Ga. 2006) (finding that the court could consider the hearing transcript in ruling on a 12(b)(6) motion to dismiss the complaint in an IDEA appeal because "the hearing record, including the transcript, must be included with the initial pleading seeking review"). Here, both parties are well aware that the Court would be required to consider the administrative record in rendering its decision in this case. Plaintiffs refer extensively to the administrative record in their Amended Complaint and specifically request that the Court "[r]eview the entire Administrative Record." (Am. Compl. 52.) Accordingly, the Court will consider the entire administrative record in determining whether dismissal is appropriate.

The precise standard of review a district court should use when examining the record in an IDEA appeal has been described by the

Eleventh Circuit "as 'puzzling' and 'somewhat confusing.'" *Walker County Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000) (citations omitted).  The Eleventh Circuit requires the district court to "conduct[] an entirely *de novo* review of the ALJ's findings," while granting the district court the "discretion to determine the level of deference it will give to the ALJ's findings." *CP v. Leon County Sch. Bd. Fla.*, 483 F.3d 1151, 1156 n.4 (11th Cir. 2007).  At the same time, however, "the administrative decision in an IDEA case is entitled to due weight and the court must be careful not to substitute its judgment for that of the state educational authorities." *Walker County Sch. Dist.*, 203 F.3d at 1297.  In addition, because Plaintiffs are proceeding in this Court *pro se*, the Court will "construe the complaint more liberally than it would construe formal pleadings drafted by lawyers." *Powell v. Lennon*, 914 F.2d 1459, 1463 (11th Cir. 1990) (citing *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam)).  After reviewing the administrative record using the foregoing standard, the Court grants Defendant's motion to dismiss.

BACKGROUND

## I.   M.W.'s Identification and Screening

In September 2004, when M.W. was three years old, Plaintiffs enrolled him in a private preschool at Green Acres Baptist Church in Athens, Georgia.  While attending Green Acres, M.W.'s teachers noticed that he had difficulty engaging with his peers, playing

4

appropriately with toys, and attending to and taking direction from his teachers.  In addition, M.W. would beat on glass and attempt to run out of the room if not carefully supervised. (Ex. R-16 at 1-232, Nov. 5th IEP Docs.[2])  At that time, M.W. had not yet been identified as autistic and was therefore receiving no special educational assistance in the classroom.  Because of these behavior problems and their own concerns regarding M.W.'s behavior at home, Plaintiffs referred M.W. to Defendant Clarke County School District for evaluation in the fall of 2004. (*See, e.g.,* Hr'g Tr. V 1144:13-15, Sept. 27, 2005.)

On October 6, 2004, Defendant conducted an initial evaluation screening of M.W.  Based on this evaluation and parent interviews, Defendant recommended further evaluation for special education services.  On October 27, 2004, Patrick Kennedy, a school psychologist employed by Defendant, conducted a Preschool Psychoeducational Evaluation Report of M.W.  Mr. Kennedy personally observed M.W. in the Green Acres classroom and also employed a number of recognized evaluative techniques to assess  M.W.'s behavior, cognitive ability, communication skills, self-help skills, and social skills.[3]  Mr. Kennedy noted that M.W. spoke both English and Mandarin

---

[2]Unless otherwise noted, the exhibits referred to in this Order are the exhibits submitted to the ALJ during the administrative hearing. Plaintiff's exhibits are referred to as "Ex. P-#" and Defendant's are "Ex. R-#."

[3]The initial psychoeducational evaluation did not evaluate M.W.'s needs for specific types of services such as occupational therapy; rather, it appeared to be designed to determine whether M.W. was eligible for

Chinese and permitted Plaintiffs to accompany M.W. during the testing.

Although Mr. Kennedy noticed that M.W. "demonstrated sufficiently complex communication skills" and "demonstrated some indications of very good cognitive ability, [M.W.] never sustained his effort or interest in the presented tasks." (Ex. R-21 at 1-247, Kennedy Evaluation.) Because of M.W.'s lack of attention and effort, Mr. Kennedy concluded that "the present intellectual estimate [was] very likely a gross underestimate of [M.W.'s] true capabilities." (*Id.* at 1-252.) However, based on the entirety of the test results, Mr. Kennedy was still able to determine that M.W. was "demonstrating patterns of social behavior that are common to children diagnosed with autism" and recommended "that the evaluative data be considered as support for eligibility [for special education services] through the program definition of Autism." (*Id.* at 1-253.)

## II.  **The November IEP and Provision of Services**

On November 5, 2004, Defendant convened a meeting to discuss and formulate an Individualized Educational Program ("IEP") for M.W. Plaintiffs attended the November 5th IEP meeting along with Ms. Sims, the special education teacher; Carole Davis, the preschool special education team leader; Janet Dicker, M.W.'s regular education teacher at Green Acres; Melia Digby, a speech/language pathologist; and Mr. Kennedy.  Plaintiffs enumerated three chief areas of concern: M.W.'s

---

special education services in general.

social skills, attention, and behavior.  (Ex. R-16 at 1-238.) Plaintiffs also sought additional testing, including an independent psychoeducational evaluation, occupational therapy testing, and an assistive technology assessment.  In addition, Plaintiffs requested a behavior intervention plan if necessary.  (*Id.* at 1-236 to 1-238.)

The parties also discussed whether M.W. would be able to continue in the Green Acres classroom.  The consensus was that the Green Acres placement was "not meeting [M.W's] social/attention needs." (*Id.* at 1-238 to 1-239.)  After some discussion, the parties agreed that the most appropriate placement for M.W. was in Joy Sims's classroom at Fourth Street Elementary School, a public school within the Defendant school district.[4]

Ms. Sims's classroom was a self-contained, direct services classroom specially designed to provide autistic children with intensive and focused learning.[5]  The classroom consisted of no more than six children, and at least three adults were present in the classroom at any given time.  (Hr'g Tr. I 146:4-14, May 24, 2005.)

---

[4]Ms. Sims has a bachelor's degree in education and is certified in both elementary and special education.  She also has a master's degree in behavioral disorders and autism and a preschool certification from the University of Georgia.  She has ten years' experience teaching students with autism and other disorders and has been specially trained in methodologies used to instruct autistic students including verbal ABA, Lovaas, and TEACCH.  (Hr'g Tr. I 116:3-121:13, May 24, 2005.)

[5]In a "direct services" classroom, students attend the same classroom in which they receive special education services.  In other words, the child is not removed from the classroom to receive various types of therapy.  A classroom is considered to be "self-contained" if a child spends more than half of his or her day in a direct services classroom. (*See* Hr'g Tr. IV 975:12-25, Sept. 26, 2005.)

Specially-trained and certified staff members provided services using two research-based methods proven to be particularly effective in educating children with autism: (1) applied behavioral analysis ("ABA"), a structured instructional method used to teach verbal communication and (2) discrete trial training ("DTT"), an intensive system of drill and practice.  To help address the social deficits experienced by children with autism, neurotypical peers were invited into Ms. Sims's classroom for an hour every day to serve as peer role models, and one day a week, Ms. Sims's students joined typical peers in a collaborative pre-K classroom for breakfast.[6]  As students progressed in Ms. Sims's classroom, they were also afforded opportunities to engage with typical peers and practice social skills in the collaborative classroom.  (*See, e.g.,* Ex. R-49 at 3-30, Parent-Teacher Journal Entries.)  An extensive collection of data reflecting individualized goals and progress was maintained for each child in Ms. Sims's classroom, and Ms. Sims communicated frequently with each child's parents.  (*See, e.g.,* Hr'g Tr. I 152:4-155:3.)  In addition to other types of communication, Ms. Sims corresponded daily with Plaintiffs in a journal, at Plaintiffs' request. (*See generally* Ex. R-49.)  The program was overseen by Dr. Coby Lund, a board-certified behavior analyst.  (Hr'g Tr. I 147:4-148:16.)

---

[6]The collaborative classroom is a regular educational setting for four-year-old, pre-kindergarten students.  It is co-taught by a regular education teacher and a special education teacher and consists of both neurotypical and disabled children.

The parties all appeared to treat the November 5th IEP as a temporary plan for several reasons.  First, Ms. Sims explained that once M.W. was enrolled in her classroom, she would conduct a comprehensive evaluation called the Assessment of Basic Language and Learning Skills ("ABLLS") which would allow her to develop appropriate, targeted goals for M.W.[7]  The completed ABLLS would serve as the curricular tool which would guide M.W.'s future educational program.  Second, the parties understood that Mr. Kennedy's evaluation was likely an understatement of M.W.'s true cognitive abilities because M.W. was unable to focus enough to participate fully in the assessment.  Finally, the parties recognized that M.W. spoke more Mandarin Chinese than English, which may have also skewed the results of the cognitive testing portions of the Kennedy evaluation.

At the conclusion of the November 5th IEP meeting, Plaintiffs signed a form indicating their consent to M.W.'s placement but noted that their consent was only to "the initial placement.  Adjustment may be needed as more information is available to parents."  (Ex. R-15 at 1-215, Parental Consent for Placement Form.)  In addition, Plaintiffs again requested an occupational therapy evaluation, requested that M.W. be enrolled in a "Sensory Learning Program" in Newnan, Georgia, and requested an independent educational evaluation

---

[7]The ABLLS is an assessment that is often given to children with autism or other communication disorders.  The assessment examines hundreds of different skills in twenty-five different skill areas; it therefore often takes several weeks to fully administer.

("IEE") at public expense to compare with the Kennedy evaluation.[8] All parties clearly agreed that M.W. was eligible for special education services to help address his autism.

### III. Plaintiffs' Rejection of the November 5th IEP and their Growing Concerns with M.W.'s Placement

Despite having initially consented to M.W.'s placement, Plaintiffs began expressing uncertainty regarding the appropriateness of the November 5th IEP almost immediately following the November 5th IEP meeting.   For example, Plaintiffs believed a Mandarin Chinese interpreter should be involved in the ABLLS and that M.W. would have difficulty learning social skills in a classroom where all students were on the autism spectrum.   (*See, e.g.,* Ex. R-49 at 3-31.)   Dr. Wang wrote letters to Dr. Michael Blake, Director of Student Services at the CCSD, and Ms. Davis, requesting, among other things, an IEE at public expense; an occupational therapy evaluation; the sensory learning program; adequate ABA training of any personnel working with M.W.; daily ABA intervention at home; and English as a second language instruction.   (Ex. R-48 at 2-91 to 2-92, Miscellaneous Correspondence.)   The letter to Ms. Davis further stated, "Because of the concerns above about [M.W.'s] current placement and IEP, we are not able to approve and sign the [November 5th] IEP as it stands." (*Id.* at 2-92.)

---

[8]Plaintiffs requested an occupational therapy evaluation as early as October of 2004; however, Defendant had not yet determined whether M.W. was eligible for special education services at that time.   Immediately following the November 5th IEP meeting where M.W. was found eligible for services, Ms. Sims arranged for an occupational therapy evaluation.

M.W. continued to attend Ms. Sims's classroom throughout the fall.  By December of 2004, Plaintiffs contend that M.W. had begun using repetitive and non-functional, or echolalic, speech and became less responsive at home.  Plaintiffs also observed M.W. exhibiting odd behaviors in the home environment, such as "chirping," banging his head, and flapping his hands.  Because autistic children often exhibit similar self-stimulating behaviors and because M.W. had relatively well-developed imitation skills, Plaintiffs concluded that M.W. learned the behaviors in Ms. Sims's classroom and was imitating them at home.  Plaintiffs communicated these concerns to Defendant. (*See, e.g.,* Ex. R-49 at 3-24.)

On December 12, 2004, Ms. Gao observed M.W. in Ms. Sims's classroom for the first time.  In her December 12th journal entry, Ms. Gao requested that an IEP meeting be set up as soon as possible, and Ms. Sims began making arrangements the next day.  (Ex. R-49 at 3-21 to 3-22.)  By mid-December, Ms. Sims completed the ABLLS, and the school district completed two occupational therapy evaluations by early January.  The parties agreed to conduct their next IEP meeting on January 28, 2005.[9]

In the meantime, Plaintiffs sought an IEE from Dr. Joseph Campbell, an autism expert at the University of Georgia.  Dr. Campbell's evaluation took place over two days, December 14, 2004 and January 5, 2005; the evaluation could not be completed on December

---

[9]The school was closed for the winter holidays from December 13, 2005 through January 3, 2005.

14, 2004 because M.W.'s poor behavior interfered with the testing process. Dr. Campbell used a Mandarin Chinese interpreter unfamiliar with M.W. or his family to assist in his evaluation. During cognitive, language, and fine motor testing, the evaluators administered test items in English, according to standardized procedures. If M.W. was unable to respond in English, the interpreter would translate the test item into Mandarin Chinese, and M.W. was given the opportunity to respond in either English or Mandarin Chinese. If M.W. provided a correct answer in either language, he received credit for a correct response. (Ex. R-46 at 1-392, Campbell Final Report.) Plaintiffs also withdrew M.W. from school on January 14, 2005 and January 16, 2005 through January 28, 2005 so that M.W. could attend the Newnan sensory learning program at Plaintiffs' expense.

**IV.  The January IEP and Provision of Services**

The January 28th IEP meeting was attended by Dr. Wang; Chris Walker, Defendant's low-incidence disability specialist[10]; Ms. Sims, the special education teacher; Eden Gillespie, a dually-certified regular and special education teacher who taught in the collaborative classroom; Melia Digby, a speech/language pathologist; Karin Barker, an occupational therapist; and Dr. Lund. With Dr. Wang's input, the parties incorporated additional social goals into the January 28th

---

[10]A low-incidence disability specialist works with students with moderate to severe intellectual disabilities or autism, which comprise a relatively small population of all disabled students.

12

IEP. (*See* Ex. R-2 at 1-81, Unofficial Transcript of January IEP Meeting.) The parties also agreed to increase M.W.'s speech therapy time, add occupational therapy, and incorporate two hours per week of at-home ABA therapy into M.W.'s IEP. (*See, e.g.,* Ex. R-1 at 1-1, January 28th IEP Documents.) Throughout the meeting, Dr. Wang emphasized that he believed that M.W.'s goals and objectives were too easily accomplished, that M.W.'s current program was not intensive enough, and that M.W. was regressing and should be placed in a regular education setting. (*See, e.g.,* Ex. 2 at 1-62; 1-72; 1-74.)

Plaintiffs filed their first request for a due process hearing on January 30, 2005 (the "First Request"). The First Request sought (1) "an educational setting at school that minimizes [M.W.'s] chances of imitating inappropriate (autistic) behaviors—he should not stay in the current environment at school, and should be placed in a school closer to home"; (2) "35 hours per week of discrete trial training for two years by trained ABA therapists, with supervision of BCBA certified behavioral analyst(s)"; (3) and "30 minutes per day of 1:1 individual speech therapy and 30 minutes per day of 1:2 group speech therapy, for two years." (Ex. R-48 at 2-35.) Plaintiffs also sought reimbursement for the expenses associated with M.W.'s participation in the sensory learning program. (*Id.*) M.W. continued to attend Ms. Sims's classroom while the parties awaited resolution of the First Request.

13

**V.   Plaintiffs' Unilateral Withdrawal of M.W. from Ms. Sims's Class**

By early February 2005, Plaintiffs were convinced that M.W. was regressing as a direct result of his placement in Ms. Sims's classroom, and they again requested another placement.  When Dr. Wang observed the classroom in February 2005, "he was shocked by what he observed."  (Am. Compl. ¶ 46.)  Dr. Wang alleges that he

> witnessed crying, inappropriate communication, too much noise, lots of time out for children, aggressive children, grimacing, violence, children just left to play by themselves with no interaction, one child running wild and making aggressive gestures, [and] M.W. eating and having recess in the self contained classroom or self contained play area with no neurotypical peers[.]

(*Id.*)  Ms. Gao observed the classroom three more times, in February, March, and April of 2005.  Ms. Gao testified that she saw children hitting and kicking, moaning, screaming, crying, and acting inappropriately.  (*See, e.g.,* Hr'g Tr. VII 1721:3-9, Sept. 30, 2005.)  This testimony is bolstered by audiotapes of the classroom, made without Ms. Sims's knowledge or permission.[11]  (*See, e.g.,* Hr'g Tr. II, 221:10-222:3, May 25, 2005; Ex. P-6, Audio Recordings.)  Ms. Gao also felt like Ms. Sims's paraprofessionals were assisting M.W. too much with his work and that the children did not play appropriately

---

[11]The ALJ found, and the Court agrees, that these recordings were not necessarily representative of the day-to-day environment in Ms. Sims's classroom.  Although Plaintiffs observed the classroom for six hours per day, each tape consisted of less than an hour of recording.  Most of the recording took place during morning play and/or times of transition, when there would be an expected increase in noise and activity.  In addition, one recording was made during a tornado drill and two recordings were made on days when a substitute teacher was present.  (*See* Hr'g Tr. VIII 1842:20-1850:17, Sept. 30, 2005.)

in the classroom when left alone.  (Ex. R-49 at 3-5; Am. Compl. ¶ 29a.)  In addition, Ms. Gao questioned the safety of Ms. Sims's classroom.  In April of 2005, M.W. came home from school with a cut or a scratch on his back, and he told Ms. Gao that another child had hurt him.  On another day in April, M.W. came home from school with blood on his shirt, and Ms. Sims told Ms. Gao the blood was from a nosebleed.[12]  (*See* Am. Compl. ¶¶ 47a & 47b.)  Ms. Gao also thought that a stack of "six metal legged chairs piled right above her son's head" during nap time was dangerous.  (Am. Compl. ¶ 47d.)

A hearing on the First Request was scheduled for March 8, 2005 before ALJ Foster, but after the first day of testimony, Plaintiffs dismissed the hearing.[13]  (Hr'g Tr. 128:12-16, Mar. 8, 2005.)  On March 16, 2005, Plaintiffs retained attorney Chris Vance and filed a second due process request (the "Second Request").  The Second Request alleged that (1) many of the goals set forth in M.W.'s IEP had already been mastered by M.W., and the IEP omitted critical

---

[12]M.W. had a nosebleed on one of his first days at school.  (*See* Ex. R-49 at 3-32.)  Ms. Sims testified that when she explained to Ms. Gao that M.W.'s nose had bled, Ms. Gao said that M.W.'s nose sometimes bled when he had allergies.  (Hr'g Tr. 176:13-18.)  Plaintiffs contend that they never told Ms. Sims this and that the only time M.W. had ever had a nosebleed was when his older brother accidentally bumped him in the nose, apparently implying that the blood on M.W.'s shirt must have been from some type of injury.  (Am. Compl. ¶ 47b.)

[13]Plaintiffs claim that "they had to withdraw [from] the hearing about three hours after it was commenced on March 8, 2005 to seek counsel because they perceived bias and prejudice by the Administrative Law Judge (ALJ) Chris Foster who presided [at] the hearing."  (Am. Compl. ¶ 4.)  At the second hearing, Plaintiffs—now represented by counsel—filed a motion to require ALJ Foster to recuse himself for bias.  (*See* Ex. IV to Am. Compl.)

social and communication goals; (2) M.W.'s placement was inappropriate because he was learning to imitate typically autistic behaviors; (3) M.W.'s IEP did not properly address M.W.'s sensory issues; (4) M.W. was not given an appropriate amount of 1:1 education; (5) M.W. was not being provided with a sufficient amount of active engagement; (6) M.W.'s IEP was not based on M.W.'s individualized needs; (7) M.W.'s language needs were not being met; (8) M.W. was not provided with sufficient education in the home environment; (9) the IEP lacked extended school year services and extended school day services; (10) Defendant excluded Plaintiffs' participation in the IEP process; and (11) the IEPs were based on assessments conducted in English rather than Mandarin Chinese, M.W.'s native language. (Request for Due Process Hr'g 000023-000024, Mar. 16, 2005.) Plaintiffs also sought reimbursement for the costs of the Newnan sensory learning program and independent educational evaluations of M.W. (*Id.* at 000024-000025.) On April 20, 2005, before the due process hearing on the Second Request, Plaintiffs unilaterally withdrew M.W. from school. The withdrawal came after Ms. Gao "witnessed one child who was large and strong sit and pound on the table, making a very loud noise and throwing food, until he just collapsed on the floor, kicking and hitting the paraprofessional, who could not stop him from being violent." (Am. Compl. ¶ 29a.)

On May 6, 2005, the parties held another IEP meeting to recommend services for the 2005-2006 school year and for the summer of 2005 (the extended school year, or "ESY"). Plaintiffs did not agree with the recommendations and did not re-enroll M.W. in the Defendant school district. Instead, Plaintiffs re-enrolled M.W. at Green Acres, hiring what they contend was "an ABA trained paraprofessional (aide/shadow) support for facilitation of social skills." (Am. Compl. ¶ 49a.) Although M.W. attended Green Acres for only a short time, Plaintiffs allege that M.W. "made excellent progress" at Green Acres with the support of his aide, Rose Ding. (*Id.*) Plaintiffs paid Ms. Ding $274 for her services and paid $120 in tuition to Green Acres.[14]

## VI. The Due Process Hearing on the Second Request

From May 24 through May 26, 2005, an evidentiary hearing on the Second Request was conducted in Athens, Georgia. Continuances were granted to both parties, and the hearing resumed on September 26, 2005 and concluded on September 30, 2005. The record was closed on December 8, 2005, when the parties filed their proposed findings of fact and conclusions of law.

On March 6, 2006, ALJ Foster filed his Final Decision, finding (1) the IEPs and services provided by CCSD during the 2004-2005 school year offered M.W. FAPE in the LRE; and (2) Plaintiffs were not

---

[14]Plaintiffs also delivered a due process request for ESY 2005, which was apparently resolved by the parties. The due process request for ESY 2005 was not at issue before the ALJ, and it is consequently not at issue before this Court.

entitled to any reimbursement for any privately obtained educational services, therapies, or testing. (Final Decision 2, March 6, 2005.) Plaintiffs filed this action on June 7, 2006, appealing the ALJ's decision.  After the Court granted several extensions of time and granted Plaintiffs' motion to amend their original complaint, Defendant filed the presently-pending motion to dismiss on December 11, 2007.  For the following reasons, the Court grants Defendant's motion.

DISCUSSION

**I.   Plaintiffs' Standing to Sue**

Defendant first argues that because Plaintiffs failed to assert any claims on their own behalf in the court below, they are barred from raising any claims on appeal.  At the time this case was originally filed, a circuit split existed on the question of whether a parent, acting *pro se*, could represent the interests of his child in an IDEA challenge in federal court.  A recent decision by the United States Supreme Court partially resolved this split.  *See Winkelman v. Parma City Sch. Dist.*, 127 S. Ct. 1994 (2007).  In *Winkelman*, the Supreme Court determined that the plain language of the IDEA conveys enforceable rights to parents that are independent from those rights belonging to their disabled child.  The Court concluded that because "IDEA grants parents independent, enforceable rights" that "encompass the entitlement to a free appropriate public education for the parents' child," "they are, as a result, entitled

18

to prosecute IDEA claims on their own behalf." *Id.* at 2005, 2006. Moreover, the Court determined "that IDEA does not differentiate . . . between the rights accorded to children and the rights accorded to parents." *Id.* at 2004.   Thus, parents seeking relief in federal district court may challenge "not only . . . the procedures and costs implicated by this process, but also . . . the substantive decisions to be made." *Id.*   These "substantive decisions" include the determination of whether the parents' child received FAPE in the LRE. *See id.* at 2005.[15]

Throughout this litigation, Plaintiffs have challenged the substantive determination of whether M.W. received FAPE in the LRE and have sought reimbursement for their provision of private education to M.W.   In light of the Supreme Court's decision in *Winkelman* and the fact that the IDEA allows "any party aggrieved" by the final decision of an ALJ "to bring a civil action . . . in a district court of the United States, without regard to the amount in controversy," 20 U.S.C. § 1415(i)(2)(A), the Court rejects

───────────────

[15]The parents in *Winkelman* also questioned "whether IDEA entitles parents to litigate their child's claims *pro se*." 127 S. Ct. at 2007. However, the Court declined to reach that issue in light of their decision that parents could enforce their own substantive rights under IDEA.  Thus it appears that *Devine v. Indian River County School Board*, 121 F.3d 576 (11th Cir. 1997) [hereinafter *Devine I*] remains controlling precedent in this jurisdiction.   *Devine* holds that while IDEA allows parents to sue on behalf of their disabled child, the statute does not specifically allow a non-lawyer parent to act as counsel in the lawsuit.  *Id.* at 581.   The court reasoned in part that "parents who are not attorneys may not bring a *pro se* action on their child's behalf . . . because it helps to ensure that children rightfully entitled to legal relief are not deprived of their day in court by unskilled, if caring, parents." *Id.* at 582.

Defendant's contention that Plaintiffs should be foreclosed from bringing the presently pending action.

## II.  Plaintiffs' Claims

One of the primary purposes of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. 1400(d)(1)(A).  To this end, the United States Supreme Court has required state and local educational agencies to provide a disabled child "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 203 (1982).

In this case, Plaintiffs claim that Defendant failed to provide M.W. FAPE in the LRE.  Plaintiffs seek (1) "a Judgment that Defendant CCSD denied M.W. access to an education in the LRE and caused M.W.'s harm and regressions"; (2) "a Judgment declaring that CCSD denied M.W. a FAPE in the LRE"; (3) "injunctive relief requiring Defendant CCSD stop depriving M.W.'s right to a FAPE in the LRE"; (4) "reimbursement in the amount of $354 for the cost of educating their son in the LRE with the support of a supplementary aid, as well as $3624.22, their total out of pocket costs for the transportation and Sensory Learning Program the parents provided to M.W."; (5) "court costs, expenditures and reasonable attorney's fees"; and (6) "[s]uch

other and further relief as this Court deems just and proper." (Am. Compl. 52-53.) Based on its thorough review of the administrative record, the Court finds that Defendant provided M.W. with FAPE in the LRE and that Plaintiffs have not met their burden of showing they are entitled to reimbursement for any educational services or testing they provided. Accordingly, Defendant's motion to dismiss is granted.

A.    Defendant Educated M.W. in the LRE

Plaintiffs first contend that the ALJ erred in determining that M.W. was educated in the LRE. The IDEA provides that "to the maximum extent appropriate," children with disabilities should be

> educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). This provision is also known as the IDEA's "mainstreaming" requirement. In order to accomplish this goal, school districts "shall ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.551(a) (2006). This continuum must include a variety of alternative placements such as "instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions." *Id.* § 300.551(b)(1) (2006). In

addition, school districts must "[m]ake provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement." *Id.* §300.551(b)(2) (2006).

The ALJ found that "since the [Defendant] does not have its own public school program for non-disabled three year-old students, within the continuum of services provided directly by the [Defendant], M.W. was in the least restrictive environment." (Final Decision ¶ 92.) The ALJ reasoned that "not only was M.W.'s program in a regular elementary school, but the [Defendant] provided him with regular opportunities to participate on a daily basis with typically developing peers in the collaborative pre-K classroom." (*Id.*) For the following reasons, the Court finds that Defendant met its statutory obligation to educate M.W. in the LRE. In the alternative, the Court concludes that Plaintiffs have failed to meet their burden to show that their unilateral placement of M.W. at Green Acres was appropriate, and therefore Plaintiffs are not entitled to reimbursement for such placement.[16]

_____

[16]The Eleventh Circuit has determined that "a purpose of the [IDEA] . . . is to make public schools the preferred setting." *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1285 (11th Cir. 2008). Thus, the IDEA "'contemplates that such education will be provided where possible in regular public schools'" although the IDEA "'also provides for placement in private schools at public expense where this is not possible.'" *Id.* (quoting *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985)). As discussed in section II.B., *infra*, the Court finds that M.W. was offered FAPE in the regular public school operated by Defendant. The Court therefore observes that it is unclear whether Defendant was required to consider private placement at all once it determined that its own direct services classroom would provide M.W. with FAPE. *See Hjortness ex*

### 1.   *Defendant Considered a Continuum of Placements*

Plaintiffs first assert that Defendant failed to provide and consider a continuum of placements that would meet M.W.'s individual educational needs.   More specifically, Plaintiffs contend that Defendant failed to consider educating M.W. in the regular education environment with the use of supplementary aids and services. Plaintiffs argue that M.W. flourished in the regular education environment when they unilaterally placed him in Green Acres with the support of Ms. Ding, and thus Ms. Sims's classroom could not possibly have been M.W.'s LRE.

The record establishes that, in accordance with the IDEA, Defendant had a range of educational opportunities available to satisfy its individual students' needs.   Dr. Michael Blake, director of student services for the school district, testified that the school district offered pre-K students a continuum of special education services that included consultation services, community-based programs such as Green Acres, collaborative educational settings, and direct services classrooms.   (Hr'g Tr. IV 823:4-824:16, Sept. 26, 2005.)   The record also shows that this range of opportunities was discussed with Plaintiffs.   For example, the minutes from the November 5th IEP meeting note:

---

*rel. Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1066 (7th Cir. 2007) (holding that a school district generally does "not need to consider private placement once it determine[s] that public placement [is] appropriate.").

> Placement options were discussed.  There is not a regular
> public education program in school for three year olds.
> Parents expressed a desire for strong language program.
> Current attendance at [Green Acres] is not meeting his
> social/attention needs.  .  .  .  Parents, after some
> discussion, agree that the 30 seg/wk VB class [Sims's
> classroom] is most appropriate.

(Ex. 16 at 1-238 to 1-239.)  Ms. Sims confirmed that the minute

sheet's reference to "placement options" related to the discussion of

"the feasibility of M.W. continuing in [the Green Acres] environment

and receiving the services that he needed to meet the goals and

objectives that we had just developed.  And the team, including the

parents, agreed that that was not an option for M.W. at that time[.]"

(Hr'g Tr. I 142:10-21.)  In addition, Sims testified that

> we discussed all the settings, we talked about the fact
> that M.W. was currently already enrolled in a typical
> program at Green Acres, we talked about the viability of
> putting support there, community-based instruction,
> different things were discussed.  If I remember correctly,
> the mother was very much in favor of the full-time program
> which was one of the options that we were looking at versus
> him staying in his current placement at Green Acres.

(*Id.* at 140:8-24; *see also* Hr'g Tr. II 285:4-287:25 ("We talked about

[M.W.] continuing at Green Acres and different levels of support, but

the parents felt that was not something appropriate at the time.

It's not what they wanted.").

The record also reveals that the parties considered a regular

education setting for M.W. during the January 28th IEP meeting.  Dr.

Wang's comments regarding his preferred placement are reflected in

the unofficial transcript of the meeting minutes:

> So in that regular classroom environment, [M.W. is] not
> able to function without support.  That does not mean that
> he should be put in a regular classroom with a parapro.
> That's not what I meant.  I'm thinking he should be in
> small groups with—that's what Dr. Campbell recommended.
> With regular peers—two kids—one is M.W., the other is a
> regular functioning kid to play with him and then you have
> a therapist to facilitate a game.

(Ex. R-2 at 1-74.)  The school professionals at the January 28th IEP

meeting also discussed the potential difficulties with instructing

M.W. in a regular educational setting.  For example, Dr. Lund said,

"You also want them to get specialized instruction, and that's not

going to happen in a regular ed class.  There's just no way a regular

ed teacher can do several hours of one-on-one instruction." (*Id.* at

1-79.)  It thus appears that the regular education setting was

discussed and rejected by M.W.'s IEP team at the January 28th IEP

meeting.  In sum, the Court finds that Defendant complied with the

IDEA by offering and considering a continuum of educational services

to meet M.W.'s individual needs.[17]

---

[17]Plaintiffs also contend that "[n]one of M.W.'s IEPs includes the
mandated item 20 U.S.C. § 1414(d)(1)(A)(iv)."  At the time of the events
giving rise to this litigation, the IDEA required the school district to
provide "an explanation of the extent, if any, to which the child will not
participate with nondisabled children in the activities described in the
regular class and in the activities described in clause (iii)."  20 U.S.C.
§ 1414(d)(1)(A)(iv) (2005).  Plaintiffs argue that the omission of this
statement is an indicator that Defendant did not seriously consider the
availability of the regular education setting during M.W.'s IEP meetings
and that this was a procedural violation of the IDEA that denied M.W.
FAPE.  Although there is no express mention of the extent to which M.W.
would not participate with nondisabled children in the November 5th or
January 28th IEPs, the foregoing discussion confirms that the parties
discussed M.W.'s participation in the regular education setting at some
length.  (*See, e.g.,* Ex. R-2 at 1-75 to 1-77.)  Additionally, the Court
finds in section II.B. that M.W. received FAPE.  The Court therefore
concludes that the failure to include an express statement related to 20
U.S.C. § 1414(d)(1)(A)(iv) neither denied M.W. FAPE nor is convincing

### 2.   *Ms. Sims's Classroom was M.W.'s LRE*

In addition, the Court finds that Ms. Sims's classroom was the LRE for M.W.  The ALJ determined,

> Had he been placed in a regular education setting, M.W. would not have had the level of attention and engagement available in Ms. Sims' classroom.  Although M.W. was making great progress and was receiving more opportunities to interact with non-disabled peers, he was not ready, by early spring, to transition full-time into a regular education setting . . . .

(Final Decision ¶ 93.)  The Court reaches the same conclusion based on its review of the administrative record.  It is undisputed that the reason Plaintiffs initially sought special education services was because M.W. was unable to function in the regular education setting.  M.W.'s preschool teacher at Green Acres observed that M.W. had a "behavior problem," that M.W. had a "very short attention span," was "very strong-willed," "trie[d] to run out [the] door," "beat[] on glass," and "knock[ed] things over."  (Ex. R-27, Notes from November 5th IEP Meeting.)  Mr. Kennedy also observed M.W.'s attention deficits when he attempted to evaluate M.W. for special education services.  (*See, e.g.,* Ex. R-21 at 1-249 (M.W.'s "fleeting attention to, and interest in, the presented tasks did not allow the sustained attention necessary to demonstrate his capabilities.").)  The record therefore supports Defendant's position that M.W. was not ready for a regular education environment when he began attending Ms. Sims's classroom in November of 2004.

---

evidence that Defendant did not consider M.W.'s regular education needs.

Furthermore, Ms. Sims testified that even as of the January 28th IEP meeting, "M.W. was making progress, but he still was not ready" to attend a regular education classroom. (Hr'g Tr. III 473:8-11, May 26, 2005.) In fact, Ms. Sims testified that "I would not have even recommended a collaborative at that point." (*Id.* at 473:14-15.) The January 28th IEP meeting minutes also indicate that school professionals believed that M.W.'s ABA training "would be almost impossible in the regular setting" and that M.W. would require "a truckload of pull-out" from a regular education classroom to obtain all the services he needed and Plaintiffs desired.[18] (Ex. 2 at 1-96.)

The record also supports the conclusion that as M.W.'s attention and behavior improved, Ms. Sims continued to increase M.W.'s opportunities to participate in the regular educational setting. (Hr'g Tr. II 248:1-16, May 25, 2005.) Ms. Sims's goal was to gradually transition M.W. into the regular educational environment when he was ready, and Ms. Sims felt that M.W. would likely be ready for a regular educational setting by the 2005-2006 school year. (*See, e.g., id.* at 377:11-378:17.)

The actions of M.W.'s IEP team should not be judged exclusively in hindsight. "'An IEP is a snapshot, not a retrospective. In striving for "appropriateness," an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken,

---

[18]As of January 30, 2005, Plaintiffs were requesting thirty-five hours per week of DTT training. (*See* Hr'g Tr. III 1443:20-1444:1, May 26, 2005.)

that is, the time that the IEP was promulgated.'" *Mandy S. ex rel.*
*Sandy F. v. Fulton County Sch. Dist.*, 205 F. Supp. 2d 1358, 1367
(N.D. Ga. 2000) (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d
983, 992 (1st Cir. 1990)).  The fact that M.W. was allegedly able to
function in a regular educational environment with the assistance of
an interpreter does not inescapably lead to the conclusion that Ms.
Sims's classroom was not M.W.'s LRE.  Based upon M.W.'s individual
educational needs at the time his IEPs were developed-and in light of
the intensive educational program demanded by Plaintiffs-the Court
finds that Ms. Sims's classroom was M.W.'s LRE.

    3.  *Plaintiffs' Unilateral Placement was Inappropriate*

    Moreover, even if Defendant denied M.W. the LRE, Plaintiffs have
failed to meet their burden to show that they are entitled to the
relief they seek: reimbursement for their unilateral private
placement.  "It is well settled that an award of reimbursement for
the expenses of a private school is allowed under the [IDEA] when the
private placement is appropriate for the student and an educational
program at a public school has been inadequate." *Draper v. Atlanta*
*Indep. Sch. Sys.*, 518 F.3d 1275, 1285 (11th Cir. 2008).  Because
Plaintiffs in this case are seeking reimbursement for M.W.'s
placement at Green Acres, they bear the burden of showing that (1)
Defendant's placement was inappropriate and (2) their chosen
placement was appropriate. *See id.; cf. also Sch. Comm. of Town of*
*Burlington v. Dep't of Educ.*, 471 U.S. 359, 373-74 (1985) ("[P]arents

28

who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk.  If the courts ultimately determine that the IEP . . . was appropriate, the parents would be barred from obtaining reimbursement . . . .").

Here, even assuming *arguendo* that M.W. was not educated in the LRE, the Court cannot conclude from the record that Plaintiffs' unilateral placement of their son was appropriate.  First, the Green Acres regular education setting was directly contrary to the experts' recommendations.[19]  Dr. Lund, who was qualified as an expert in ABA therapy and educating children with autism, testified that in order to make educational progress, M.W. needed ABA therapy.  (Hr'g Tr. III

---

[19]Even Dr. Campbell, the expert hired by Plaintiffs to conduct an IEE of M.W., suggested that M.W. "would benefit from enrollment in a special education preschool program appropriate for a preschool child diagnosed with Autistic Disorder."  Among other things, Dr. Campbell suggested that "[w]ithin the school setting (i.e., regular education setting), [M.W.] would benefit from opportunities to interact with typically developing peers in structured social situations, such as well-defined play activities with a peer 'buddy.'"  (Ex. R-11 at 1-200 to 1-201, Campbell Evaluation Summary.)  Plaintiffs contend that this statement indicates that Dr. Campbell believed that M.W. should be instructed full-time in a regular education setting.

The Court cannot determine from the record whether Dr. Campbell's recommendation was for full-time enrollment in the regular education setting or whether the recommendation was for M.W. to be enrolled in a class similar to Ms. Sims's classroom with regular opportunities to interact with neurotypical peers.  Plaintiffs did not call Dr. Campbell at the hearing, and they actually revoked the consent which would have allowed Dr. Campbell to communicate with the school district regarding his assessment and recommendations.  (Hr'g Tr. VII 1478:24-1479:6 (Dr. Wang's testimony that he withdrew consent for Dr. Campbell to speak to Defendant about his evaluation on the weekend following the January 28th IEP meeting, before Dr. Wang delivered Dr. Campbell's final report to Defendant).)  It is clear, however, that M.W.'s January 28th IEP included most, if not all, of Dr. Campbell's other recommendations.

607:15-18, May 26, 2005.)  Ms. Ding had no training in autism and was not a certified or formally-trained ABA therapist.  (Hr'g Tr. VI 1439:19-1440:18, Sept. 28, 2005.)  In addition, Dr. Lund opined that M.W. would likely have difficulty acquiring new skills in a regular education setting, where more instruction occurs in a large group format.  (Hr'g Tr. III 682:13-21.)  Dr. Montgomery, an expert in behavioral analysis and educating children with autism, testified that DTT and massed trials are important techniques for educating autistic children; however, there is no evidence that these techniques were used in the Green Acres classroom.  (Hr'g Tr. VIII 1949:12-1953:12, Sept. 30, 2005; *see also* Hr'g Tr. VI 1439:24-1440:5.)  Ms. Sims also testified that M.W. would not have received "as much instruction as he needs" in the regular education setting with an aide because M.W. "still needs some real direct focused instruction to work on social skills" and because "he's very adult-dependent already, and I would never want to just have one adult that constantly stayed with him all day long."  (Hr'g Tr. II 385:17-25.)

Moreover, the Green Acres placement was completely at odds with the demands the Plaintiffs expressed to Defendant.  As of their January 30th due process request, Plaintiffs sought thirty-five hours per week of DTT performed by a trained ABA therapist; thirty minutes per day of one-on-one speech therapy; and thirty minutes per day of one-to-two group speech therapy, all in a regular education setting. (Hr'g Tr. VI 1447:12-1448:1; *see also* Ex. 2R- at 1-62 (transcript of

IEP meeting minutes in which Dr. Wang expresses concern that placement in the self-contained autism classroom is not intensive enough).)  Although the placement provided by Plaintiffs was in the regular education setting, Ms. Ding was not a trained ABA therapist, classes took place for twenty hours a week or less, and M.W. received no DTT during the school day.[20]  (Hr'g Tr. VI 1439:19-1440:18; 1498:14-18.)  In sum, the Court finds that Plaintiffs have not met their burden to show that the Green Acres placement was appropriate even if Plaintiffs proved M.W. was entitled to be educated in a less restrictive environment.  Defendant provided M.W. with education in the LRE, and Plaintiffs are not entitled to reimbursement for educating their son at Green Acres.

B.   Defendant Provided M.W. FAPE

Plaintiffs also contend that Defendant denied M.W. FAPE.  The Eleventh Circuit has developed a two-part test to determine whether a school board has provided FAPE: "(1) whether the state actor has complied with the procedures set forth in the IDEA, and (2) whether

_____

[20]It is also notable that at the time of the January 28th IEP meeting that is the primary subject of this dispute, Plaintiffs were actually proposing a *more* restrictive environment than Defendant was providing. Dr. Wang testified that he believed M.W. needed thirty-five hours per week of DTT training, with twenty-five of those hours administered in M.W.'s home.  (Hr'g Tr. VI 1443:20-1444:1.)  The Court observes that in IDEA cases, "[e]quitable considerations are relevant in fashioning relief,' and the court enjoys 'broad discretion' in so doing." *Draper*, 518 F.3d at 1285 (citations omitted)).  As previously discussed, Plaintiffs are asserting claims for violation of their own rights under the IDEA.  It seems less than equitable for parents to demand that the school district provide an intensive program, unilaterally place their child in a much less intensive program than that provided by the school district, claim violations of *their own* substantive rights under the IDEA, and then seek reimbursement from the school district for such violations.

the IEP developed pursuant to the IDEA is reasonably calculated to enable the child to receive educational benefit." *Sch. Bd. of Collier County, Fla. v. K.C.*, 285 F.3d 977, 982 (11th Cir. 2002). This test has been described as a "basic floor of opportunity" standard. *See, e.g., CP*, 483 F.3d at 1152. Under this standard, the "educational outcome need not maximize the child's education. If the educational benefits are adequate based on surrounding and supporting facts, [IDEA] requirements have been satisfied." *JSK v. Hendry County Sch. Bd.*, 941 F.2d 1563, 1572-73 (11th Cir. 1991) (citations omitted). The Court finds that Plaintiffs' contentions regarding Defendant's alleged procedural violations lack merit. Further, the IEP developed by M.W.'s IEP team was reasonably calculated to afford M.W. educational benefit. The Court therefore concludes that M.W. received FAPE.

### 1.   *Alleged Procedural Errors*

Plaintiffs list a number of procedural errors which they contend deprived M.W. of FAPE. However, "[a] procedurally defective IEP does not automatically entitle a party to relief." *K.C.*, 285 F.3d at 982. Rather, the reviewing court should examine the impact of the procedural defect to determine whether the defect has denied a student of a FAPE. *Id.* The Court has reviewed each of Plaintiffs' alleged procedural errors and concludes that either there was no violation or that such violation did not deny M.W. FAPE.

32

i.   INCLUSION OF NECESSARY PARTIES AT IEP MEETINGS

First, Plaintiffs contend that Defendant failed to include regular education representatives at M.W.'s IEP meetings.  34 C.F.R. § 300.344 (2006) specifies that, among other necessary parties, an IEP team must include "at least one regular education teacher of the child (if the child is, or may be, participating in the regular education environment[.])"  The ALJ found that at the November 5th IEP meeting, "all participants required by IDEA were in attendance, as well as others, including his regular education teacher from Green Acres, a special education teacher, a speech-language pathologist, a school district representative, and the school psychologist." (Final Decision ¶ 7.)  The ALJ also found that "M.W.'s father, Dr. Lund, Ms. Sims, and all required participants, attended the January 28, 2005 IEP meeting."  (*Id.* ¶ 37.)  Based on its own review of the administrative record, the Court agrees that all required participants attended M.W.'s IEP meetings.

Janet Dicker, M.W.'s regular education teacher from Green Acres, attended the November 5th IEP meeting.  (*See, e.g.,* Ex. R-16 at 1-216, 1-232.)  Eden Gillespie was specifically identified as the regular education representative at the January 28th IEP meeting. (Ex. R-2 at 1-26.)  Although Ms. Gillespie was teaching special education in the regular/special education collaborative classroom at the time of the January 28th IEP meeting, she is dually certified in both regular and special education.  (Hr'g Tr. III 449:8-450:3.)  The

33

ALJ found that "Ms. Gillespie's dual certification and knowledge of the children in the classroom where M.W. might spend some portion of his day, qualifies her to provide insight from both a regular and special education standpoint." (Final Decision ¶ 81.) The Court agrees, and therefore concludes that properly-constituted IEP teams were present at both IEP meetings.

ii.  PARENT PARTICIPATION IN THE IEP PROCESS

Plaintiffs next contend that Defendant "exclud[ed Plaintiffs] from full and effective participation in the decision making process" regarding M.W.'s education. Federal regulations require local school districts to "take steps to ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate[.]" 34 C.F.R. § 300.345 (2006). "[T]he IDEA envisions full parental participation in the development of the IEP," although it "does not mandate such participation in every aspect of the educational process." *Weiss by Weiss v. Sch. Bd. of Hillsborough County*, 141 F.3d 990, 997 (11th Cir. 1998). The ALJ concluded that "M.W.'s parents were assured of full participation throughout the development of the IEP." (Final Decision ¶ 84.)

The record reveals that at least one of M.W.'s parents was present at each IEP meeting, and Plaintiffs were afforded ample opportunity to convey important information about M.W. to the IEP team. M.W.'s IEP team also took Plaintiffs' suggestions into account

34

when formulating M.W.'s IEPs.  For example, when Dr. Wang expressed concern that M.W.'s fixed classroom schedule was teaching M.W. to be inflexible, the IEP team responded that they would remove or introduce systematic changes to M.W.'s daily schedule to address this concern.  (Ex. R-2 at 1-36 to 1-38; *see also id.* at 1-37 to 1-38; 1-63 to 1-65; 1-66 to 1-68 (other suggestions made by Dr. Wang that were incorporated into IEPs).)  The IEP teams also incorporated video tapes of M.W. in his home environment, research articles supplied by Dr. Wang, and the IEE solicited by Plaintiffs into the IEP team meetings.  (*See, e.g., id.* at 1-43 to 1-44; 1-47 to 1-48.)  The Court finds that Plaintiffs were permitted adequate opportunities to participate fully in the formulation of M.W.'s IEPs.

### iii. EVALUATIONS IN M.W.'S NATIVE LANGUAGE

Plaintiffs next argue that Defendant failed to test M.W. in Mandarin Chinese, which led to an inaccurate evaluation, inappropriate IEP goals and objectives, and inappropriate placement of M.W. in the self-contained autism classroom.  The federal regulations in effect at the time of the ALJ's final decision provided that when a child is evaluated for eligibility for services under the IDEA, any assessments or other evaluation materials shall be "provided and administered in the child's native language or other mode of communication, unless it is clearly not feasible to do so[.]" 34 C.F.R. § 300.532(a)(1)(ii) (2006).  The ALJ concluded that

35

Plaintiffs' native language  testing claim was without merit for four reasons:

> (1) the actual conduct of [Plaintiffs'] own purported "IEEs," including the psychological and the ABLLS, demonstrates that it was not feasible for the [Defendant]—or anyone else—to perform evaluations in Mandarin Chinese; (2) the purpose underlying the requirement that testing be in a student's native language was met in this case because the test was reasonably calculated to determine M.W.'s need for special education services, not his level of English proficiency; (3) [Defendant] properly noted that its psychological testing was not conducted under standard conditions and that the results were not a true indication of M.W.'s ability; and (4) [Defendant] properly considered all relevant information, including M.W.'s performance in the classroom environment, in developing his educational program.

(Final Decision ¶ 75.)  The Court agrees and finds there was no violation of IDEA's native language testing requirement with respect to the two types of assessments at issue in this case—the psychoeducational assessments and the ABLLS.[21]

---

[21]These two types of assessments have very different purposes.  The psychoeducational evaluation was used to determine whether M.W. was eligible for special education services.  The psychoeducational evaluation would therefore implicate the purpose of the IDEA's native language testing requirement.  The native language testing requirement ensures that "[m]aterials and procedures used to assess a child with limited English proficiency . . . measure the extent to which the child has a disability and needs special education, rather than measuring the child's English language skills." 34 C.F.R. § 300.532(a)(2) (2006).  It is undisputed that M.W. was deemed eligible for autism services based on the results of the Kennedy psychoeducational evaluation.  Because the purpose of the psychoeducational evaluation was simply to determine M.W.'s eligibility for autism services, the failure to conduct the evaluation in Mandarin Chinese is largely immaterial.

In contrast, the ABLLS would not seem to implicate the purpose underlying the native language testing requirement.  The ABLLS is not used to determine a child's eligibility for services; instead, Dr. Montgomery testified that "the purpose of the ABLLS is to determine the language skills of the individual in the language of instruction.  It's an assessment and a curriculum guide[.]"  (Hr'g Tr. VIII 1945:16-20.)  Current federal regulations provide, "The screening of a student by a

First, Plaintiffs' own expert testified that it would not have been feasible to administer a psychoeducational evaluation in Mandarin Chinese. (Hr'g Tr. VII 1593:7-15.) Second, the experts in this case appear to agree that using interpreters to help administer certain portions of a psychoeducational evaluation would affect the accuracy and legitimacy of the results. (*See, e.g.,* Hr'g Tr. III 569:17-570:7 ("[I]n testing in general when you deviate from the norm . . . it invalidates the results.").) Defendant's expert, Dr. Montgomery, testified that the administration of a Mandarin Chinese language cognitive assessment to a student in Georgia would be "difficult to see . . . as possible" because in order to produce valid results, any such assessment would have to be (1) written in Mandarin Chinese; (2) normed to a United States population; and (3) given by a licensed psychologist or physician whose first language was Mandarin Chinese. (Hr'g Tr. VIII 1928:4-1929:7.) The Court therefore finds it was not feasible to administer such an assessment in Mandarin Chinese. *See Park ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1033 & n.3 (9th Cir. 2006) (finding it was not feasible to assess child in Korean when conducting assessment

---

teacher or specialist to determine appropriate instructional strategies for curriculum implementation shall not be considered to be an evaluation for eligibility for special education and related services." 34 C.F.R. § 300.302 (2008). It is therefore unclear whether Defendant was even obligated to attempt to conduct the ABLLS in M.W.'s native language.

with the assistance of an interpreter was "detrimental to the assessment's validity").[22]

Similarly, it was clearly not feasible to administer the ABLLS to M.W. in Mandarin Chinese. Dr. Lund searched, without success, for a Mandarin Chinese version of the ABLLS. (Hr'g Tr. III 569:7-16.) Perhaps more importantly, however, various experts testified that it was important for the ABLLS to be conducted in English. Because English was the language of instruction, M.W.'s teachers needed to understand what M.W. knew how to do in English, rather than Mandarin Chinese. (See, e.g., Hr'g Tr. IV 763:2-4 (Ms. Sims testified: "I believe that to instruct [M.W.] in English . . . we need to know what he knows in English."); Hr'g Tr. VII 1699:20-25 (Ms. Hetzel responded affirmatively to the question, "And if I was going to do an assessment . . . in a classroom that's in English in order to build

_____

[22]It is also undisputed that M.W. underwent a psychoeducational evaluation using a Mandarin Chinese interpreter at public expense. Plaintiffs were reimbursed for Dr. Campbell's evaluation, which was conducted with the use of an interpreter, and Defendant attempted to incorporate Dr. Campbell's recommendations into M.W.'s IEP. (Ex. P-2 at 1-48, 1-50.) Plaintiffs distributed Dr. Campbell's preliminary report at the January 28th IEP meeting, and there was a general consensus among the educational professionals present that they needed to involve Dr. Campbell so that he could explain his recommendations in further detail. Plaintiffs, however, revoked their consent to have Dr. Campbell speak with Defendant on January 30, 2005, before Dr. Campbell presented his final report to Defendant.

It is notable that during the Campbell evaluation, "[M.W.] reliably responded to items administered in English by responding in English," and "[M.W.] responded most frequently in English and [] correct responses in Chinese were few." (Ex. R-46 at 1-392.) This suggests that the language difficulties experienced by M.W. and his need for Mandarin Chinese testing were perhaps less severe than perceived by Plaintiffs. Additionally, as discussed infra, M.W. made significant educational progress in Ms. Sims's classroom despite any alleged language barrier. Thus, the failure to conduct any assessment in M.W.'s native language did not deny M.W. FAPE.

a curriculum for a child, wouldn't I need to do the assessment in English to understand what they can do in English?").)   Dr. Montgomery also testified that if testing in the native language was not feasible, then testing in the language of instruction would be most relevant and appropriate.   (Hr'g Tr. VIII 1941:17-1942:21; *see also id.* at 1962:20-1963:8 (Dr. Montgomery's opinion that if the sole language of instruction was English, tests and other evaluation materials would not necessarily have to be administered in a child's native language).)   It is beyond dispute that the language of instruction in Ms. Sims's classroom is English and that Plaintiffs wanted their son to be educated in English.  (*See, e.g.,* Ex. R-2 at 1-53 (Dr. Wang said, "I agree 100%, we are not asking or thinking [M.W.] should be instructed in Chinese.")  The Court concludes that it was not feasible to administer a Mandarin Chinese ABLLS to M.W. because no such instrument existed and that testing in Mandarin Chinese would not have provided M.W.'s instructors with the information they needed to construct an English-language curriculum. In sum, the Court finds there was no procedural violation regarding Defendant's alleged failure to evaluate M.W. in Mandarin Chinese.[23]

>    2.   *Reasonably Calculated to Provide Educational Benefit*

---

[23]Even if the Court were to conclude that any alleged failure to test M.W. in his native language was a procedural violation, there is no evidence that the procedural violation denied M.W. FAPE.  As discussed more thoroughly in section II.B.2.ii, *infra*, M.W. made progress while enrolled in Ms. Sims's classroom, despite any alleged language barrier.

Plaintiffs next allege that M.W.'s IEP was not "reasonably calculated to enable [him] to receive educational benefit." *K.C.*, 285 F.3d at 982.  More specifically, Plaintiffs contend that M.W.'s IEP (1) failed to consider M.W.'s unique and individual needs as a high-functioning autistic child;[24] (2) failed to provide adequate parent training and a home behavioral intervention plan; (3) failed to provide a thorough and timely occupational therapy evaluation; and (4) failed to consider M.W.'s limited English proficiency needs. Plaintiffs contend that these failures caused M.W. harm and regression, and they seek reimbursement for their placement of M.W. at Green Acres, for their provision of the Newnan sensory learning program that addressed M.W.'s occupational therapy needs, and for an ABLLS conducted in Mandarin Chinese.

The ALJ concluded that even if Defendant had the burden of proof on this issue, M.W.'s IEP was reasonably calculated to afford M.W. educational benefit.  The ALJ reasoned that Defendant "provided significant special education services to M.W., set appropriate and measurable goals and demonstrated that M.W. made academic and behavioral gains in the placement in Ms. Sims' classroom." (Final Decision ¶ 95.)  For the following reasons, the Court agrees and finds that M.W. received FAPE; therefore Plaintiffs' contentions are without merit.

---

[24]Dr. Campbell found that "[a]mong children diagnosed with autism, [M.W.] is considered 'high functioning' due to his age-appropriate cognitive and language functioning." (Ex. R-11 at 1-200.)

i.   CONSIDERATION OF M.W.'S UNIQUE NEEDS

Plaintiffs first contend that Defendant used a "one size fits all" method of developing M.W.'s IEP by failing to consider the fact M.W. is a high-functioning autistic child with well-developed imitation skills.  Plaintiffs contend that after only a short time in Ms. Sims's classroom, M.W. began imitating "typical" autistic behavior which he learned from the other children in the class. Plaintiffs contend that Defendant's failure to draft IEPs that considered M.W.'s unique needs caused these regressions, and he was therefore denied FAPE.[25]

IDEA regulations provide that "[t]he services and placement needed by each child with a disability to receive FAPE must be based on the child's unique needs and not on the child's disability."  34 C.F.R. § 300.300(a)(3)(ii) (2006).  A disabled child's IEP thus plays

_____

[25]This claim appears to largely duplicate Plaintiffs' claim that M.W. was not educated in the LRE.  In support of their contention, Plaintiffs produced expert testimony suggesting that M.W. could not receive an appropriate education in a classroom that was too loud or crowded, or where he might be tempted to model inappropriate or violent social behaviors.  (Hr'g Tr. VII 1625:1-1626:2 (testimony of Kellie Hetzel).) However, undisputed record testimony shows that M.W. was well behaved in the classroom and that his behavior never impeded his ability to learn. For example, the January 28th IEP states, "No behaviors are noted at school that are disruptive to [M.W.'s] progress or the progress of others."  (Ex. R-1 at 1-2.)  Both Ms. Sims and Dr. Lund testified that any noise or distraction in Ms. Sims's classroom had no effect on M.W.'s educational progress.  (Hr'g Tr. II 422:4-5 (Ms. Sims testifies, "Even if a child is crying or upset, it has not bothered him, it has not slowed his progression."; Hr'g Tr. III 610:16-19 (Dr. Lund testifies that he never observed M.W. being distracted by the behavior of other children while he was receiving DTT in Ms. Sims's classroom).)  There is simply no evidence in the record to support Plaintiffs' contention that M.W.'s placement in Ms. Sims's classroom did not permit him to make educational gains.

an important role in his or her education.  The "'IEP is more than a
mere exercise in public relations.  It forms the basis for the
[disabled] child's entitlement to an individualized and appropriate
education.'"  *CP*, 483 F.3d at 1153 (quoting *Doe v. Ala. State Dep't
of Educ.*, 915 F.2d 651, 654 (11th Cir. 1990)).  In determining
whether a child's IEP is sufficient to provide FAPE, "courts must
only determine whether the child has received the basic floor of
opportunity. . . . The IEP and the IEP's educational outcome need not
maximize the child's education."  *JSK*, 941 F.2d at 1572-73.  In other
words, so long as the child's IEP provides some educational benefit,
"under the IDEA, there is no entitlement to the 'best' program."
*M.M. ex rel. C.M. v. Sch. Bd. of Miami-Dade County*, 437 F.3d 1085,
1102 (11th Cir. 2006).

The administrative record belies Plaintiffs' contention that
M.W.'s IEP was not designed to meet his unique needs and that he
suffered harm and regression as a result.  Defendant took steps to
ensure that M.W.'s IEPs met his individual educational needs.  Each
child in Ms. Sims's classroom had a different schedule tailored to
that child's particular needs, and copious data was taken and
analyzed individually for each student.  (Hr'g Tr. I 149:18-21;
152:6-8.)  Ms. Sims testified that the November 5th IEP was

> based on the evaluation results as well as the input from
> parents at that meeting, and we all acknowledged and knew
> at the time that [the goals contained in the IEP] may not
> be the most appropriate goals for M.W., and that . . . was
> a starting point . . . and that once [the ABLLS] was

42

completed, we would meet again and we would rewrite the goals and objectives as appropriate.

(*Id.* at 163:20-164:4.)  M.W.'s January 28th IEP was based upon the ABLLS, a ninety-page assessment which takes nearly six weeks to administer.  (*Id.* at 157:7-17.)  Dr. Wang also made various suggestions at the January 28th IEP meeting that were incorporated into M.W.'s IEP.  (*See, e.g.,* Ex. R-2 at 1-37 to 1-38; 1-63 to 1-65; 1-66 to 1-68.)  The Court thus concludes that M.W.'s IEPs were reasonably calculated to provide him with some educational benefit.

Even more importantly, M.W.'s IEPs did provide him with educational benefit.  Ms. Sims testified that M.W. "made slow, steady progress" in her program.  (Hr'g Tr. I 166:8.)  Ms. Sims testified that initially, M.W. "could not sit and attend, he was still wearing pull-ups, it was reported that he wouldn't use utensils well, he wouldn't sit a[t] meal time, . . . he would only make [] repetitive marks, . . . he wouldn't greet people, [and] he wouldn't acknowledge people when they spoke to him."  (*Id.* at 166:14-24.)  Ms. Sims further testified that at least by January, and certainly by April, M.W. (1) had learned to sit in a small group and was progressing to a larger group setting; (2) learned to attend in a group setting; (3) learned to greet his peers and his teachers; (4) began to engage in spontaneous play; and (5) began engaging in social exchanges with peers.  (*Id.* at 167:1-168:3.)  In addition, M.W. made progress on the majority of the skills measured by the ABLLS during his enrollment in Ms. Sims's classroom.  Dr. Lund testified that the number of skills

M.W. was able to complete increased by approximately twenty percent from December until May.[26]  (Hr'g Tr. III 598:8-601:20; *see also id.* at 470:13-23.)   Accordingly, the Court finds that M.W.'s IEPs provided him, at the very least, with the "basic floor of opportunity" mandated by the IDEA.

ii.  CONSIDERATION OF M.W.'S LANGUAGE NEEDS

Plaintiffs next contend that Defendant failed to consider M.W.'s needs as student with limited English proficiency.  The IDEA requires that "in the case of a child with limited English proficiency, [the school must] consider the language needs of the child as such needs relate to the child's IEP."  20 U.S.C. § 1414(d)(3)(B)(ii).[27]   The

---

[26]Dr. Lund testified that M.W. showed no regression in any of the skills measured by the ABLLS.  M.W. showed no improvement or regression in writing, spelling, toileting, and vocal imitation.  (Hr'g Tr. 603:7-22.)  The record does contain some evidence suggesting that M.W. may have regressed on the Vineland Adaptive Behavior Skills assessment, a test that measures "everyday skills that comprise personal and social competence.  (Ex. R-21 at 1-250.)  The results of the Vineland test are determined by analyzing parent and teacher responses to various questions.  When Mr. Kennedy conducted the Vineland assessment, M.W. received a communication score of 91, based on Ms. Gao's responses to the assessment's questions.  When Dr. Campbell conducted the Vineland assessment, M.W.'s communication scores dropped to 80 (when the respondent was Ms. Gao) and 78 (when the respondent was Ms. Sims).  (Ex. R-46 at 1-395.)  Although Dr. Lund was questioned on this difference at the hearing, he was not qualified as an expert in the field of testing and could only testify that the numbers were different.  Even if these numbers are a true indicator of regression, other testimony indicates that as a whole M.W. made significant academic and social progress over a relatively short period of time.  IDEA does not require that Defendant maximize M.W.'s potential.  *See, e.g., JSK*, 941 F.2d at 1573 ("[M]aximum improvement is never required.").

[27]Plaintiffs also sought English as a Second Language (ESOL) services.  In response to one of Plaintiffs' journal entries, Ms. Sims explained that the school district was currently unable to serve preschoolers with ESOL services because of testing difficulties.  (*See* Ex. R-49 at 3-14.)  Ms. Walker informed Dr. Wang that ESOL was not a special education service.  *See* 34 C.F.R. § 300.534(b) (2006) (noting that a child may not be

record in this case demonstrates that Ms. Sims did consider M.W.'s language needs.   For example, when Plaintiffs expressed their concerns that M.W. could "speak very few English sentences though he knows relatively more English words," Ms. Sims responded, "I will certainly be cognizant of [M.W.'s] language needs while working with him.  He has done very well so far but if I see him having difficulty and it is language related, I will certainly make arrangements for you or your wife to assist me." (Ex. R-49 at 3-30 to 3-31.)  In the January 28th IEP meeting, Ms. Sims stated that M.W.'s "English is excellent, he communicates very well with us."  (Ex. R-2 at 1-33.) Ms. Sims testified at the hearing below that "English is the language [M.W.] uses in the classroom, and he uses it very functionally and well."  (Hr'g Tr. II 301:24-302:1.)

Plaintiffs argue that Defendant's failure to consider M.W.'s language needs is reflected in his IEP goals and objectives.  Because M.W. was tested in English only, many of his goals and objectives were skills he had already mastered in Mandarin Chinese or at home. However, Plaintiffs' argument is refuted by the expert testimony presented at the hearing below.  Dr. Montgomery testified that one of the hallmarks of a child with autism is the inability to generalize a skill across various settings; thus, even if an autistic child

---

determined to be a child with a disability if the sole "determinant factor for that determination is . . . [l]imited English proficiency.").  In response, Dr. Wang indicated that he would contact state authorities to see if he could obtain ESOL services for M.W.  (*See* Ex. R-2 at 1-82 to 1-83.)

understands a concept in one language, he will often have to be re-taught skills related to that concept in another language. (Hr'g Tr. VIII 1986:12-1987:2.)  Similarly, an autistic child who has mastered a skill in the home setting will often have to be re-taught the skill in the educational setting. (*See, e.g., id.* at 1983:15-1984:2.)  In sum, it is clear to the Court that Defendant recognized M.W.'s potential language difficulties and considered them in formulating M.W.'s IEPs.  In addition, the Court is unable to locate evidence in the record that suggests that any language barrier prevented M.W. from making adequate educational progress in Ms. Sims's classroom. Plaintiffs' contentions are therefore without merit.

> iii. PARENT TRAINING AND HOME BEHAVIORAL INTERVENTION PLAN

Plaintiffs next contend that they did not receive a home behavioral intervention plan until April 27, 2005, that Ms. Gao received only a half-hour of parent training, and that no one monitored the home behavioral intervention plan as recommended in Dr. Lund's report. (Hr'g Tr. VII 1733:13-1734:22; *see also* Ex. R-55, Behavior Intervention Plan, April 25, 2005.)  The IDEA requires that "in the case of a child whose behavior impedes the child's learning or that of others, [the school must] consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior[.]" 20 U.S.C. § 1414(d)(3)(B)(i).  To the extent a child's behavior impedes his progress in school—or the progress of his classmates—parent training and a home behavioral

46

intervention plan can be "related services" required under the IDEA and its regulations. *See* 34 C.F.R. § 300.24 (2006) (defining "related services" as "supportive services as are required to assist a child with a disability to benefit from special education").

It is clear, however, that such additional services are only required to the extent necessary to allow the child's progress *in the classroom*. *See, e.g., JSK*, 941 F.2d at 1573 (defining "'appropriate education' as making measurable and adequate gains in the classroom"); *see also L.G. ex rel. B.G. v. Sch. Bd. of Palm Beach County*, 255 F. App'x 360, 365 (11th Cir. 2007). In other words, "generalization across settings is not required to show an educational benefit." *Devine v. Indian River County Sch. Bd.*, 249 F.3d 1289, 1293 (11th Cir. 2001) [hereinafter *Devine II*]. In *Devine II*, the parents contended that their child did not receive a FAPE because although he "demonstrated serious behavioral problems at home," the school failed to address the child's "educational needs in the home environment." *Id.* at 1292. The Eleventh Circuit found that if "'meaningful gains' across settings means more than making measurable and adequate gains in the classroom, they are not required by [IDEA] or *Rowley*." *Id.* at 1293 (internal quotation marks and citation omitted) (alteration in original).

In this case, just as in *Devine II*, one of Plaintiffs' chief allegations is that Defendant failed to adequately address M.W.'s home behaviors. Because it is apparent from the record, however,

that M.W. was making adequate progress in the classroom, the IDEA did not obligate Defendant to provide at-home services. The record demonstrates that M.W.'s classroom behavior was actually very good and did not impede his learning. (See Ex. R-1 at 1-2 ("No behaviors are noted at school that are disruptive to his progress or the progress of others.") Ms. Sims testified that "M.W. never exhibited in my classroom any behaviors that would warrant a behavior plan." (Hr'g Tr. I 160:1-3.) Dr. Lund also testified that he had never seen any indication that the kinds of behaviors he saw in M.W.'s home were repeated in the school environment and that he had never seen any indication that M.W.'s home behavior issues impacted his ability to learn in the educational environment. (Hr'g Tr. III 564:12-20.) Because M.W.'s behavior issues did not impede his education or the education of his classmates, Defendant was not obligated to provide a behavioral intervention plan or at-home services in addition to those already received by Plaintiffs.[28] Any such failure therefore could not have denied M.W. FAPE.

---

[28]The record reflects that Defendant provided Plaintiffs with a behavioral intervention plan and at least some in-home parent training. At the January 28th IEP meeting, Defendant agreed to provide Plaintiffs with two hours a week of discrete trial ABA services in the home, and Dr. Lund visited the home to provide additional advice. Dr. Lund testified that the level of parent training services he provided to Plaintiffs was "more than what typically occurs in most school systems" and that behavioral intervention plans are not usually provided for the way a child behaves in the home. (Hr'g Tr. III 596:9-19.) In addition, Defendant offered the services of a "parent mentor," which Plaintiffs declined. The parent mentor was the parent of an autistic child hired by the school district on a part-time basis to provide assistance to parents of other disabled children. (Hr'g Tr. IV 861:18-864:12.)

iv.   OCCUPATIONAL THERAPY EVALUATION AND SENSORY
LEARNING PROGRAM

Finally, Plaintiffs contend that Defendant should have provided M.W. with occupational therapy services starting on November 9, 2004. Plaintiffs met with Defendant on October 13, 2004 and requested an occupational therapy evaluation to address sensory problems they believed M.W. was experiencing.   On October 23, 2004, Plaintiffs provided written, albeit informal, consent to the occupational therapy evaluation.   Plaintiffs argue that Defendant's failure to provide these services prompted them to withdraw M.W. from school for two weeks so that he could attend a sensory learning program in Newnan, Georgia.   Plaintiffs seek reimbursement for the costs associated with their provision of this program.

Like a behavioral intervention plan or parent training, occupational therapy is a related service that is only required if necessary to "assist a child with a disability to benefit from special education." 300 C.F.R. § 300.24 (2006); *see also JSK*, 941 F.2d at 1573.   The Court finds that M.W. did not need the sensory learning program to make adequate progress in the classroom.[29]   It

─────────────

[29]The Court also notes that at the time Plaintiffs withdrew M.W. to attend the sensory learning program, Defendant was attempting to evaluate M.W.'s occupational therapy needs in a reasonably timely manner.   Current Georgia Department of Education Rules and federal regulations provide that individual initial evaluations should be conducted within sixty days of receiving parental consent for the evaluation.   34 C.F.R. § 300.301(c)(1)(i) (2008); Ga. Dep't of Educ. Special Educ. R. 160-4-7-.04. Even assuming these regulations apply to an occupational therapy evaluation, Defendant conducted the evaluation within sixty days of Dr. Wang's first request.   Dr. Wang first gave consent to have M.W. evaluated for occupational therapy needs on October 23, 2004.   (Ex. R-31 at 1-265,

appears that M.W., like many autistic children, may have had some sensory-related difficulties.  For example, the Kennedy evaluation reported that M.W. walked on his toes, was very sensitive to tactile stimulation, and would become frustrated or angry when his hands were dirty, sticky, or wet.  (Ex. R-21 at 1-252.)  However, there is no evidence that these sensory-related issues impeded his capacity to learn in Ms. Sims's classroom.  Ms. Sims testified that she never noticed "any sensory issues that interfered with or that were major in [M.W.'s] learning." (Hr'g Tr. II 361:23-25.)  Ms. Sims testified that although she used a weighted vest to provide M.W. with additional sensory input on one occasion, she would have needed to use the vest or related devices more frequently if M.W. had a significant sensory issue.  (*See id.* at 362:2-8.)  Furthermore, Dr. Wang testified that neither of the completed occupational therapy evaluations recommended a program such as the sensory learning program.  (Hr'g Tr. VII 1509:15-18.)  Because the Court cannot conclude that the sensory learning program was necessary to allow M.W. to benefit from special education, Defendant's failure to provide the sensory learning program did not deny M.W. FAPE.

---

Request for Evaluation.) Ms. Sims referred M.W. for occupational therapy evaluation on November 5, 2004.  (Ex. R-24, Referral Form.)  M.W. was evaluated by therapist Karin Barker on December 2, 2004 and January 5, 2005.  (Ex. R-13, Occupational Therapy Evaluation.)  At Plaintiffs' request, Defendant also arranged and paid for an additional occupational therapy evaluation specifically directed to sensory issues. (Hr'g Tr. IV 838:17-25; 839:9-11.)  Sixty calendar days from October 23, 2004 would have been December 22, 2004.  Defendant therefore appears to have evaluated M.W. for occupational therapy services in a reasonably timely manner.

CONCLUSION

In sum, after conducting its own review of the administrative record in this case, the Court finds that M.W. received FAPE in the LRE, and Plaintiffs are not entitled to reimbursement for any privately-obtained education, support, or testing of M.W. Defendant's Motion to Dismiss (Doc. 59) is therefore granted.[30]

IT IS SO ORDERED, this 29th day of September, 2008.

S/Clay D. Land

CLAY D. LAND
UNITED STATES DISTRICT JUDGE

---

[30]The Court reached its decision in this case based upon the present administrative record. Although Plaintiffs never made a formal motion to supplement the administrative record, they did request in their Amended Complaint that the Court "[h]ear additional evidence relevant to the Amended Complaint." (Am. Compl. 52.) The Court is presently of the opinion that any additional proffer would not change the outcome in this case. Furthermore, it appears that the Court has discretion whether to allow additional evidence and to determine the form in which any supplemental evidence is received. *See Walker County Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1298, 1299 & n.12 (11th Cir. 2000). Nevertheless, if Plaintiffs believe that additional evidence would have an effect on the Court's Order, they shall be allowed to file a motion for reconsideration of this Court's Order within thirty days of today, and they shall include in any such motion a specific proffer of what the additional evidence would include and how it would impact the Court's decision rendered today. Plaintiffs' brief in support of any motion for reconsideration shall be limited to ten pages. Defendant shall have twenty days to respond to any motion for reconsideration and its brief shall likewise not exceed ten pages. There will be no extensions of time or page limitations.